```
                                                                                    C/M
```

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------- X
                                                         :
OWEN MARLON ALEXANDER,                                   :
                                                         :
                                    Plaintiff,           :    **MEMORANDUM DECISION**
                                                         :    **AND ORDER**
                - against -                              :
                                                         :    18-cv-1433 (BMC) (RER)
PROGRAM DEVELOPMENT SERVICES,                            :
INC.,                                                    :
                                                         :
                                    Defendant.           :
-------------------------------------------------------- X

**COGAN**, District Judge.

Plaintiff *pro se* commenced this action alleging that he was subjected to a hostile work environment; discriminated against because of his race, gender, and national origin; and retaliated against in violation of Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000e *et seq.*, while he was employed by Program Development Services, Inc. ("PDS"). Plaintiff also claims that he was discriminated against because of his disability in violation of the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101 *et seq*. Defendant has moved for summary judgment on plaintiff's claims. For the reasons below, defendant's motion is granted.

## BACKGROUND

In support of its motion for summary judgment, defendant has submitted a Local Rule 56.1 Statement of Undisputed Facts. Plaintiff did not file a responsive statement, despite receiving notice of the consequences of and burden on a motion for summary judgment, and despite the Court's repeated encouragement that he utilize the City Bar Justice Center in preparing his opposition to defendant's motion. Accordingly, the Court has conducted its own review of the record and accepts those statements in defendant's Local Rule 56.1 submission that

are supported by admissible evidence, drawing all reasonable inferences in plaintiff's favor. See Giannullo v. City of New York, 322 F.3d 139, 140 (2d Cir. 2003). The following facts are undisputed.

Defendant, PDS, is a not-for-profit organization with a residential services program that operates dozens of residential sites for individuals with developmental disabilities. Defendant hired plaintiff on May 24, 2012 to work at its residence at 860 East 38th Street in Brooklyn, New York. Plaintiff was originally hired as a relief worker, but in May 2013, he became a direct support professional ("DSP"). As a DSP, plaintiff assisted the residents with their daily living routines.

On October 30, 2016, plaintiff walked into a room in the main eating and living area at the 38th Street residence in which Shelly Ann Miller (another DSP) and Pauline Fiddler (a manager at the residence) were using a phone to take pictures of their bodies, including their private areas, although the women were clothed. This "photo session" lasted for about 30 to 60 seconds. Plaintiff asked the women if they needed any help, the women realized plaintiff was in the room and stopped taking pictures, and they all laughed and the women walked out of the room. Plaintiff never told anyone about this incident.

There were also times when Fiddler was so angry that she would use profanities. Before Fiddler left PDS, on November 8, 2016, Fiddler told plaintiff that she enjoyed working with him and made a sexually explicit comment to him. Plaintiff never told anyone about this comment or Fiddler's use of profanity.

On December 4, 2016, Karen Morales (another DSP) repeatedly called plaintiff by a sexually explicit and degrading name throughout their shift. Plaintiff asked Morales if she would stop calling him by that name if he performed oral sex on her. Morales agreed, so plaintiff

2

performed oral sex on Morales. Later that day, Morales approached plaintiff by running at him without her pants or underwear on, jumping up, and forcing plaintiff to perform oral sex on her again, which he proceeded to do. Plaintiff did not push Morales away or stop because he did not want to hurt Morales or make it seem like he was assaulting her.

On June 4, 2017, Shirley Samuel (another DSP) was angry with plaintiff for calling his band manager during work. Samuel got in plaintiff's face and said aggressively that he needed to get off the phone. Shirley also tapped plaintiff on his head. Plaintiff walked away and went into the bathroom to avoid any conflict. Morales followed plaintiff into the bathroom and started hitting him. Plaintiff told Morales that he needed to urinate and defecate, but instead of leaving, Morales told plaintiff to go ahead and use the bathroom. Plaintiff exposed himself, but he did not urinate or defecate. Plaintiff asked Morales if she would leave him alone if he performed oral sex on her again. Morales said yes and pulled down her pants. Plaintiff cannot remember whether he performed oral sex on her, but Morales eventually left the bathroom.

Plaintiff had several supervisors over the course of his employment, including individuals named Pauline Fiddler, Shashada Reddick, Christopher Joseph, Jerry George, Celane Brown, and Lynn Vero. If plaintiff wanted to meet or speak with any of his superiors, he could call them or go to the residence between 11:00 a.m. and 5:00 p.m., when they would be in the office.

Plaintiff tried to call a supervisor the night of December 4, 2016, after the first incident with Morales. The call went to voicemail, but the voicemail box was full, so plaintiff could not leave a message. Plaintiff thereafter did not talk to any of his supervisors in person, although he could have gone to see them in their offices to discuss the incident or anything else. On December 8, 2016, plaintiff spoke on the phone with Reddick, but plaintiff did not tell Reddick what happened between him and Morales.

3

After the December 2016 incident with Morales, plaintiff also tried to call Brown. Plaintiff left a voicemail for her. They later had a conversation, but it was brief and concerned trouble that plaintiff was having with his vacation time. Plaintiff did not try to call Vero, because she was the boss.

Plaintiff again tried to speak with Reddick. He went to Reddick's office and told her that he was being bullied. Reddick gave plaintiff a piece of paper and asked him to write down what happened, but plaintiff did not complete it because plaintiff felt that there was something wrong with that. Plaintiff did not tell Reddick anything other than his feeling that he was being bullied.

Plaintiff also went to George's office on April 25, 2017 and told George that he was being bullied. During this conversation, however, plaintiff asked George how to deal with bullying, but then changed the subject to plaintiff's music and asked George whether PDS would sponsor a benefit concert. Plaintiff did not tell George about the incidents that happened in 2016. Later, George called plaintiff to his office to discuss plaintiff's grievances about bullying, but plaintiff refused to talk to George about it, and would only discuss issues that plaintiff was having with his vacation time.

Plaintiff filed an EEOC charge on July 14, 2017, while he was still employed at PDS, related to the incidents described above. After he filed this charge, in early August 2017, PDS engaged a law firm to investigate plaintiff's claims. The law firm reviewed documents and interviewed 11 witnesses over the course of its three-week investigation into plaintiff's EEOC allegations. During the investigation, plaintiff twice refused to speak to defendant's lawyer in person because plaintiff did not also have a lawyer with him. Plaintiff also refused to speak to defendant's lawyer over the phone. On September 14, 2017, the law firm submitted its investigation report to PDS, in which it concluded that there was no evidence to support

plaintiff's claims of national origin discrimination, sexual harassment, or retaliation, and that the evidence suggested that plaintiff's allegations of sexual assault against Morales were false.

On September 12, 2017, plaintiff reported to Reddick that he saw Dorothy Shand (another DPS) kick a resident in the leg on September 2, 2017.[1] PDS's Employee Handbook provides that if a PDS employee suspects that a resident is being abused, the employee is required to intervene and immediately report that abuse to a supervisor. This handbook is given to every PDS employee. There is no evidence in the record whether plaintiff received the handbook in accordance with PDS's practice, but plaintiff knew that he could be disciplined or fired for not reporting this incident of abuse right away.

PDS also conducted an investigation into this incident. Plaintiff once again refused to be interviewed or otherwise cooperate with PDS's investigation into this matter, except when he me briefly with the investigator (during which he refused to cooperate), plaintiff asked whether he was going to be fired.

PDS notified plaintiff on September 19, 2017 that his employment with PDS was terminated because he made false accusations of sexual assault against a co-worker and refused to participate in the investigation of the assault of a resident.

## DISCUSSION

### I.  Title VII

#### A. *Hostile Work Environment*

Plaintiff claims that he was subjected to a hostile work environment as a result of the sexual harassment that he experienced at the 38th Street residence.

---

[1] In response to defendant's question during plaintiff's deposition asking whether plaintiff saw this incident happen on September 2, 2017, plaintiff testified that "[i]t was a Saturday." The Court takes judicial notice that September 2, 2017 was a Saturday. Moreover, PDS's Executive Director's declaration submitted in support of defendant's motion for summary judgment attests that defendant observed this incident approximately two weeks before he reported it to PDS, which plaintiff does not dispute. Thus, the Court finds that it is undisputed that the alleged incident of abuse happened on Saturday, September 2, 2017.

5

"In order to establish a hostile work environment claim under Title VII, a plaintiff must produce enough evidence to show that 'the workplace is permeated with discriminatory intimidation, ridicule, and insult, that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment.'" Gorzynski v. JetBlue Airways Corp., 596 F.3d 93, 102 (2d Cir. 2010) (quoting Demoret v. Zegarelli, 451 F.3d 140, 149 (2d Cir. 2006)). "[A] plaintiff alleging a hostile work environment must demonstrate either that a single incident was extraordinarily severe, or that a series of incidents were sufficiently continuous and concerted to have altered the conditions of her working environment." Alfano v. Costello, 294 F.3d 365, 374 (2d Cir. 2002) (internal quotation marks and citations omitted). "This test has objective and subjective elements: the misconduct shown must be severe or pervasive enough to create an objectively hostile or abusive work environment, and the victim must also subjectively perceive that environment to be abusive." Id. (internal quotation marks and citations omitted).

"Beyond demonstrating a hostile work environment," however, a plaintiff must also "show a basis for imputing the objectionable conduct to the employer." Gorzynski, 596 F.3d at 102 (citing Alfano, 294 F.3d at 373). If "the alleged harasser is in a supervisory position over the plaintiff, the objectionable conduct is automatically imputed to the employer." Id. But "[w]here an employee is the victim of . . . harassment in the form of a hostile work environment, by non-supervisory co-workers, an employer's vicarious liability depends on the plaintiff showing that the employer knew (or reasonably should have known) about the harassment but failed to take appropriate remedial action." Petrosino v. Bell Atl., 385 F.3d 210, 225 (2d Cir. 2004).

Here, plaintiff has not established any dispute of material fact sufficient to defeat defendant's motion for summary judgment of his hostile work environment claim.

Plaintiff's hostile work environment claim based on Morales's sexual conduct towards him fails because this conduct cannot be imputed to PDS. Morales and plaintiff were both DSPs, so Morales did not have any supervisory role over plaintiff. And plaintiff testified that he never told any of his superiors at PDS about the incidents with Morales. Although plaintiff tried to call his supervisors after the December 2016 incident and could not leave a message, plaintiff had ample other opportunities to inform PDS of Morales's conduct. He elected not to tell anyone. Even after plaintiff told two supervisors that he was being bullied, and the supervisors tried to learn more about the circumstances of the "bullying" to which plaintiff alluded, plaintiff refused to discuss it. He turned down multiple opportunities to talk to a male supervisor, he turned down multiple opportunities to talk to a female supervisor, and he refused to talk about it in person, in writing, or over the phone. Moreover, he was the one to change the topic during these conversations. Thus, PDS did not, could not, and should not have known anything about the sexually explicit conduct plaintiff describes, especially given that the nature of the conduct he describes is far from what is usually referred to as "bullying."

Plaintiff's hostile work environment claim based on Fiddler's sexually explicit and profane conduct fails because this conduct does not amount to a hostile work environment. As an initial matter, plaintiff's deposition testimony establishes that he did not find Fiddler's conduct personally offensive. But even if he did, and even assuming that objectively Fiddler's conduct was hostile, these two incidents are isolated and episodic, which is not enough to establish a hostile work environment under Title VII. "Isolated acts, unless very serious, do not meet the threshold of severity or pervasiveness." Alfano, 294 F.3d at 374. None of the incidents

7

that plaintiff points to are serious. The "photo session" was not intended to be seen by other employees, and Fiddler and Miller stopped taking pictures and left when they realized that plaintiff was also in the room and could see what they were doing. Fiddler's repeated use of profanity when she is frustrated is not the type of conduct that creates a hostile work environment as envisioned under Title VII. And Fiddler's sexually explicit comment that she made to plaintiff as she was leaving her employment at PDS does not rise to the level of a comment that alters the nature of plaintiff's work environment.

In other words, even though this conduct is vulgar, it is nowhere near bad enough or pervasive enough to withstand summary judgment. Thus, plaintiff's claim for a hostile work environment under Title VII is dismissed.

### B. Discrimination

Plaintiff claims that he was discriminated against because of his race, gender, and national origin while he was employed by PDS. He indicates that his race is "human," his gender is male, and his national origin is Trinidadian.

The only part of the record that relates to plaintiff's claim that he was discriminated against on the basis of his gender is plaintiff's conclusory deposition testimony that the above incidents occurred because he was male and because the allegedly harassing coworkers were female. This is not a factual allegation, it is a legal conclusion, and it is not enough to defeat defendant's motion for summary judgment.

Nothing in the record supports plaintiff's bare allegations that he was discriminated against because of his race or national origin. Plaintiff's discrimination claim must therefore be dismissed.

## C. Retaliation

Plaintiff claims that PDS retaliated against him. His complaint does not explain the basis for this claim, but plaintiff explained during his deposition that he believes that PDS terminated him in retaliation for filing his EEOC charge.

Title VII retaliation claims are reviewed under the burden-shifting approach articulated in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973). Under the first step of that framework, "the plaintiff must establish a *prima facie* case of retaliation by showing 1) 'participation in a protected activity'; 2) the defendant's knowledge of the protected activity; 3) 'an adverse employment action'; and 4) 'a causal connection between the protected activity and the adverse employment action.'" Zann Kwan v. Andalex Grp. LLC, 737 F.3d 834, 844 (2d Cir. 2013) (quoting Jute v. Hamilton Sundstrand Corp., 420 F.3d 166, 173 (2d Cir. 2005)). Plaintiff's burden at this step is minimal.

Undisputed facts establish the first three factors of a *prima facie* case of discrimination: plaintiff filed an EEOC charge, PDS was aware of this charge, and plaintiff was fired. The crux of plaintiff's claim lies in whether his termination was casually connected to his EEOC charge.

"Title VII retaliation claims must be proved according to traditional principles of but-for causation." Univ. of Texas Sw. Med. Ctr. v. Nassar, 570 U.S. 338, 360 (2013). "This requires proof that the unlawful retaliation would not have occurred in the absence of the alleged wrongful action or actions of the employer." Id. Here, PDS informed plaintiff that his employment was terminated because he made false allegations of sexual assault against a co-worker and because he refused to participate in an agency investigation into the alleged abuse of an individual at the 38th Street residence. Although plaintiff's termination was related to the content contained within his EEOC charge, this connection does not establish the but-for cause

9

of his termination, and plaintiff does not point to anything else to suggest a direct causal link, other than legal conclusions.

Even where the record is devoid of direct evidence of causation, however, "a plaintiff can indirectly establish a causal connection to support a . . . retaliation claim by showing that the protected activity was closely followed in time by the adverse [employment] action." Zann Kwan, 737 F.3d at 845 (alterations in original) (internal quotation marks omitted).

Plaintiff filed his EEOC charge on July 14, 2017. PDS notified plaintiff on September 19, 2017 that his employment with PDS was terminated, two months after plaintiff filed his EEOC charge. That is enough to establish a *prima facie* case of indirect causation under the first step of the McDonald Douglas framework. See Gorzynski, 596 F.3d at 110 ("Though this Court has not drawn a bright line defining, for the purposes of a *prima facie* case, the outer limits beyond which a temporal relationship is too attenuated to establish causation, we have previously held that five months is not too long to find the causal relationship.").

Thus, under the McDonnell Douglas framework, the burden shifts to defendant to advance a "legitimate, non-retaliatory reason for" plaintiff's termination. Defendant has advanced two such reasons to plaintiff: that he made false accusations of sexual assault against a co-worker and refused to participate in an agency investigation into abuse of a resident. Defendant also states that it fired plaintiff because he waited 10 days to report an incident of abuse, in violation of PDS's Employee Handbook.

"[A]fter the defendant has articulated a non-retaliatory reason for the employment action, the presumption of retaliation arising from the establishment of the *prima facie* case drops from the picture." Zann Kwan, 737 F.3d at 845 (citing Weinstock v. Columbia Univ., 224 F.3d 33, 42 (2d Cir. 2000)). The burden therefore shifts back to plaintiff to show that the non-retaliatory

10

reason is pretextual. Plaintiff has done no such thing here. Indeed, plaintiff in his further reply in support of his opposition to defendant's motion for summary judgment concedes that he did not oppose any part of defendant's motion, because it is his position that defendant's motion made his claims stronger, not weaker. That is not the case, and even though plaintiff received notice of his burden and responsibility on summary judgment, plaintiff has not shown – besides advancing legal conclusions – that defendant's very legitimate reason for terminating him was false, and that he was actually fired for having filed an EEOC charge alleging Title VII and ADA violations.

## II. ADA

Plaintiff states in his complaint that he has bipolar disorder and alleges that PDS discriminated against him because of that disability.

The record includes no admissible evidence demonstrating that plaintiff has any actual or perceived disability, including bipolar disorder, nor does it include any evidence that the incidents discussed above or any other incidents occurred because of plaintiff's actual or perceived disability. This claim is therefore dismissed.

## CONCLUSION

Accordingly, defendant's motion [23] for summary judgment is GRANTED. The Clerk of Court is directed to enter judgment dismissing the case. The Court certifies pursuant to 28 U.S.C. § 1915(a)(3) that any appeal would not be taken in good faith and therefore *in forma*

11

*pauperis* status is denied for purpose of an appeal. See <u>Coppedge v. United States</u>, 369 U.S. 438, 444-45 (1962).

**SO ORDERED.**

Dated: Brooklyn, New York  
      June 8, 2019

                                               U.S.D.J.